```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
     United States of America,    ) Criminal Action
 3                                ) No. 1:21-cr-00056-CKK-1
                       Plaintiff, )
 4                                ) Sentencing
     vs.                          )
 5                                )
     William Vogel,               ) Washington, D.C.
 6                                ) June 16, 2023
                       Defendant. ) Time:  1:00 p.m.
 7   _____

 8                   Transcript of Sentencing
                          Held Before
 9            The Honorable Colleen Kollar-Kotelly
              United States Senior District Judge
10   _____

11                   A P P E A R A N C E S

12   For the Government:       Alexander M. Diamond
                               UNITED STATES ATTORNEY'S OFFICE
13                             FOR THE DISTRICT OF COLUMBIA
                               601 D Street, Northwest
14                             Washington, D.C. 20530

15   For the Defendant:        Eugene Ohm
                               FEDERAL PUBLIC DEFENDER FOR THE
16                             DISTRICT OF COLUMBIA
                               625 Indiana Avenue, Northwest
17                             Washington, D.C. 20004

18   Also Present:        Crystal Lustig, U.S. Probation Office

19   _____

     Stenographic Official Court Reporter:
20                             Nancy J. Meyer
                               Registered Diplomate Reporter
21                             Certified Realtime Reporter
                               333 Constitution Avenue, Northwest
22                             Washington, D.C. 20001
                               202-354-3118
23

     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25
```

1              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Criminal Case 21-056, the

3     United States v. William Vogel.

4              Counsel, would you please identify yourself for the

5     record, starting with the government.

6              MR. DIAMOND:  Alexander Diamond for the United States

7     of America.

8              THE COURT:  All right.  Good afternoon.

9              MR. OHM:  Eugene Ohm on behalf of Mr. Vogel.  Good

10    afternoon, Your Honor.

11             THE COURT:  Good afternoon.  And good afternoon,

12    Mr. Vogel.

13             If people are speaking, you can take the mask down;

14    otherwise, it's too hard to hear and get a record.

15             All right.  We're here for a sentencing.  Mr. Vogel pled

16    guilty to Count 4, parading, demonstrating, or picketing in a

17    Capitol Building.  The maximum statutory penalty is 6 months in

18    jail, the maximum fine is $5,000, and there is a restitution

19    that he's agreed to of $500.

20             I have the pretrial report, and he's in compliance.

21             I have a presentence report, the government's memorandum

22    in aid of sentencing, the defendant's memorandum in aid of

23    sentencing, videos both from the government and the defense,

24    and then two support letters.

25             Have you received those as well?

1          MR. DIAMOND:  Yes, Your Honor.

2          THE COURT:  Okay.  Good.

3       There are no objections to the presentence report.

4    Since the presentence report is undisputed, I'm accepting all

5    portions of this undisputed presentence report as findings of

6    fact pursuant to Federal Rule of Criminal Procedure

7    32(i)(3)(A).

8       The advisory sentencing guidelines do not apply.  The

9    statute applies, which is the zero to six months.  Probation

10   is a maximum five years.  Maximum fine of $5,000.  The special

11   assessment is $10.  There is no supervised release as well

12   allowed under the statute.

13      I'll adopt the presentence report as written.

14      So I can now hear from the government, defense counsel,

15   and Mr. Vogel, if he wishes to address the Court.

16          MR. DIAMOND:  Your Honor, what happened on

17   January 6th, 2021, was a national tragedy.  It was a violent

18   attack on the very institution of democracy and --

19          THE COURT:  Can you move the microphone over.  It

20   actually moves, the whole thing.  You can move it, I think.

21   Okay.  All right.

22          MR. DIAMOND:  Yeah.  Just let me know.  Is this

23   better?

24          THE COURT:  Yes, much better.  Thank you.

25          MR. DIAMOND:  As Your Honor well knows, for those who

1    knowingly joined the violent mob and invaded the U.S. Capitol,

2    there was no insignificant participation.

3         I often return to Your Honor's analogy to a flood in the

4    field because I think it best captures this.  Every member of

5    the mob, like every drop of water, was a part of the violence

6    that drowned the Capitol in chaos and insurrection on

7    January 6th.  The mob did collectively what its participants

8    could have never done as individuals.  The defendant was a

9    willing and active participant in this mob, and he must be held

10   accountable.

11        Your Honor, before I discuss the various sentencing

12   factors, I am prepared to walk through the facts of this case

13   with video evidence, but I know Your Honor has the videos.

14        THE COURT:  You can go ahead and do that.  I think

15   it's useful to remind everyone.

16        MR. DIAMOND:  Okay.  So on January 6th William Vogel

17   drove all the way from upstate New York to Washington, D.C., to

18   send a political message in support of Trump.  He first

19   attended the "Stop the Steal" rally before heading to the

20   U.S. Capitol.  He walked from the rally to the Capitol wearing

21   a large red hat that read Make America Great Again.

22        He arrived at the Capitol on the west side where

23   violence and chaos were at their worst on January 6th.  He saw

24   people tossing aside bike rack barricades to get closer to the

25   Capitol.  He saw rioters tearing and climbing the scaffolding

1      of the inaugural stage, flash-bang grenades used by the police

2      to try and keep the rioters back.  He saw the crowd break the

3      police lines and storm up the stairs.

4              And despite all of those clear signs that he could not

5      be there, he followed.  The chaos did not diminish once he

6      reached the Capitol Building.  He saw rioters pouring into the

7      building through smashed-out windows.

8              THE COURT:  Are you going to show the videos with it,

9      or are you just going through it first and then showing the

10     video?

11             MR. DIAMOND:  I'm going to show a clip shortly.

12             THE COURT:  Okay.  I'll leave it to you how you want

13     to do it.  I think it would be helpful to see the videos as

14     well.

15             MR. DIAMOND:  Okay.

16             THE COURT:  Although I've looked at them.

17             MR. DIAMOND:  Your Honor, people shouted and chanted

18     before entering the Capitol "Take it back."  And over the

19     sounds of those shouts, alarms blared.  But the defendant went

20     into the building anyway.

21             And I'm going to show a portion of the video that the

22     defendant took and posted to social media that day because it

23     underscores just how much chaos the defendant saw firsthand as

24     he approached and then entered the Capitol as a participant in

25     the riot.

1          And this is Exhibit 1, and I'm going to play it starting

2     at 46 seconds.

3               (An audio-visual recording was played.)

4          THE COURT:  Do you have -- Dorothy, can you put the

5     audio on for Sam?  And can you make that the -- can you put on

6     the -- can you see it on the screen?  No.  It's not on the

7     screen, not on the big screens.  If you could also do the video

8     for -- not the video, the audio for the chambers.

9          Have you done it for both sides?

10              THE COURTROOM DEPUTY:  Yes.

11              THE COURT:  Okay.  And then if you could -- thanks.

12         Go ahead.

13              MR. DIAMOND:  All right, Your Honor.  I'll resume.

14    I'll just note that this is inherent to the video itself.

15    There's some lag between sounds and images.  This video is a

16    compilation of videos that the defendant made.

17              THE COURT:  Sure.

18              MR. DIAMOND:  So I'm resuming at 54 seconds,

19    Exhibit 1.

20              (An audio-visual recording was played.)

21              MR. DIAMOND:  And, Your Honor, I'm going to pause

22    here at 2 minutes and 30 seconds in Exhibit 1, as you can see

23    everything I just mentioned.  You hear the deafening sound of

24    the crowd, the sound of flash-bang grenades going off, and the

25    progressive deterioration of the scaffolding that rioters were

1    tearing down as the defendant approached the Capitol.

2          And now I'm going to play another exhibit.  I'm going to

3    play Exhibit 2.  And this is a video that the defendant took on

4    his cell phone as he was entering the Capitol Building; and

5    here you're going to hear the chants of "Take it back" and hear

6    the alarms and people walking -- or crawling in through the

7    broken windows as the defendant, nevertheless, enters the

8    Capitol himself.

9          (An audio-visual recording was played.)

10          MR. DIAMOND:  I can characterize it in my own words,

11   Your Honor, but you can -- you can see in the video -- and you

12   can hear it -- it was -- it was chaos at the Capitol.  That's

13   what the defendant saw, and that's what the defendant joined

14   when he entered the Capitol despite all these clear signs that

15   he could not be there.

16          And next, Your Honor, I'm going to play a clip, a video,

17   of what the defendant saw once he entered the Capitol, because

18   it did not get -- it did not get less chaotic, and it does not

19   get less violent.  You're going to see, as you just saw, people

20   shouting, people chanting in the Capitol as the officers tried

21   to maintain order, as members of Congress were being evacuated.

22          And what did the defendant do?

23          THE COURT:  I was just -- is it his phone, or is it

24   other video from other sources?

25          MR. DIAMOND:  Right now we've only looked at video

1    from his phone.  The first exhibit was --

2                THE COURT:  Right.  But I meant --

3                MR. DIAMOND:  -- what he posted.

4                THE COURT:  -- this one that's coming up, is that

5    from his phone or something else?

6                MR. DIAMOND:  I'm going to resume Exhibit 1, which

7    was his post to social media that day.

8                THE COURT:  All right.  I didn't mean to interrupt.

9    I was just trying to figure out the sources.  Obviously, we're

10   not going to see him if he's the one doing it --

11               MR. DIAMOND:  Yes.

12               THE COURT:  -- taking the --

13               MR. DIAMOND:  Please interrupt with questions as they

14   go.  Thank you, Your Honor.

15        I'm going to pick up where we left off at 2 minutes and

16   30 seconds, which is the point at which the defendant enters

17   the Capitol in this video.

18               (An audio-visual recording was played.)

19               MR. DIAMOND:  Your Honor, I'm stopping Exhibit 1 at

20   3 minutes and 34 seconds.

21        So you could see that in -- in the Capitol, the

22   defendant walks in the door, and he goes deeper into the

23   Capitol.  He enters the Crypt.  And there you saw somebody

24   shouting "We have the power."  How did the defendant respond?

25   He says, "Amen."  You hear the chants of the people in the

1    Crypt.

2         Also -- and, again, Your Honor, I could -- I could play

3    the -- the silent Capitol security footage.  But when the

4    defendant is in the Crypt as people chant and fill the space,

5    what do we see the defendant do?  We see him hug the other

6    rioters.  We see him fist-bump the other rioters.  We see him

7    pat them on the back.

8         And, Your Honor I'm going to play one other clip, and

9    this clip is from --

10        THE COURT:  Is that the clip that you just described

11   you're going to show?

12        MR. DIAMOND:  I was just describing, Your Honor, the

13   Capitol security footage.  I would skip it because it's silent.

14   But if Your Honor could like --

15        THE COURT:  Yeah, no.  Go ahead.  Go ahead and play

16   it.

17        MR. DIAMOND:  Okay.  And, Your Honor, this is

18   Exhibit 6.  And I'm going to just skip ahead to 2 minutes and

19   30 seconds in.  Sorry.  Skip to 1 minute and 50 seconds in,

20   which is approximately 2:30 p.m. real time.

21        (A video recording was played.)

22        MR. DIAMOND:  And this video is grainy, but I'm

23   pausing it now.

24        You can see this is the defendant in his big -- big red

25   Trump hat, is the best way to follow him, and you'll see him --

1                   (A video recording was played.)

2                 MR. DIAMOND:  And I'm just pausing it, again,

3   Your Honor, where you see the defendant here, now in the middle

4   of the -- in the middle of the screen.  And I'm going to

5   resume.

6                   (A video recording was played.)

7                 MR. DIAMOND:  And you can see there he fist-bumps

8   someone and pats them on the back.

9                   (A video recording was played.)

10                MR. DIAMOND:  There again, he pats someone on the

11   shoulder.

12                  (A video recording was played.)

13                MR. DIAMOND:  Gives somebody a hug.

14                  (A video recording was played.)

15                MR. DIAMOND:  And I'm going to pause it there,

16   Your Honor, and I'm going to play another video.  This time I'm

17   going to play -- this is a video taken by another -- another

18   rioter in the Capitol.  And that was posted to YouTube, and

19   that's where this was obtained from.  And this I will pick up

20   at 33 seconds.

21            And we're going to see -- this is -- again, you're going

22   to see the defendant in the Crypt.  Actually, I realized this

23   video is sideways.  But the audio is more important here,

24   Your Honor.

25                (An audio-visual recording was played.)

1      MR. DIAMOND:  Your Honor, that was the defendant in

2  his large red Trump hat, screaming that they should send a

3  message to the Chinese communists, in the Crypt.

4      So, Your Honor, we've just seen a few video clips of

5  what the defendant himself was doing in the Capitol.  Not what

6  other people were doing.  What the defendant was doing.  And

7  what he was doing was encouraging the riot.  When he heard

8  other people chanting he said, "Amen."  He chanted himself

9  about his own political messages.

10      And as people continued to occupy the Capitol, he hugged

11  them, he fist-bumped them, he patted them on the back.  He

12  showed that he -- he was not identifying with the officers

13  trying to maintain order.  He was a member of that mob.

14      And nowhere in those videos do we see the defendant

15  discourage anybody.  We see him encouraging people, but we

16  don't hear him tell people to leave.  We don't hear him tell

17  people not to chant or to be calm.  That's not what we see.

18      And, Your Honor, even after the police started clearing

19  the area, the defendant remained in the Capitol.  And he was

20  told to leave by the police officers, and yet he stayed.

21      And, of course, even after being escorted out of the

22  Capitol by -- by U.S. Capitol Police Sergeant Jason McGinniss.

23  And Your Honor received as an exhibit to the government's

24  sentencing memorandum a -- notes from an interview with

25  Sergeant McGinniss who explained that he had to personally walk

1    a group of people outside of the Capitol because they didn't

2    listen to earlier orders to leave.  And one of those people

3    that the police sergeant had to escort out of the Capitol was

4    the defendant.

5          But even after he was escorted out of the Capitol,

6    Your Honor, he didn't leave the area.  Instead, he walked

7    around to the east side of the Capitol, stood on the steps, and

8    triumphantly waved a Trump flag.

9          And, Your Honor, I'd like to turn to the sentencing

10    factors and begin with the nature and circumstances of the

11    crime.

12          It should be said again that the violence that the

13    defendant partook in was an attack on democracy.  It was an

14    attempt to disturb the peaceful transition of power that has

15    lied at the heart of our national identity since our country

16    began.  It's hard to imagine a more severe set of surrounding

17    circumstances for this crime.

18          The defendant was a knowing and willing participant in

19    this attack.  He saw it all:  rioters shoving aside barricades,

20    rioters destroying scaffolding, police using flash-bang

21    grenades to repel the riot, rioters overwhelming those police.

22    He watched rioters climb into the Capitol through broken

23    windows.  He heard shouts to take the Capitol back, and he

24    heard alarms blaring as he followed those rioters into the

25    Capitol.  He knew what this was.  This was violence.  This was

1    an attack on the United States Capitol.

2         At the plea hearing, you asked the defendant if he was

3    aware at the time that he was not authorized to be there.  He

4    said yes.  He had opportunity after opportunity after

5    opportunity to turn around after witnessing this violence, but

6    he did not.

7         And once inside the Capitol, his participation in the

8    riot became even clearer.  Seeing and hearing the roaring mob

9    in the Crypt, he joined them in shouting his own political

10   messages.  To the other rioters, he did not once discourage

11   them.  He only did the opposite by hugging, fist-bumping, and

12   patting them on the back.  He supported what they were doing,

13   and he showed that.

14        At the plea hearing, you asked him if he knew it was

15   unlawful to demonstrate in the Capitol.  He said yes.

16        I want to note at this point, Your Honor, that the

17   defendant did not assault anybody.  This is not a mitigating

18   factor.  Those who assaulted officers have been or will be

19   charged with assault.  The defendant -- that the defendant did

20   not commit an even worse crime is not a credit against the

21   crime he did commit.

22        Similarly, Your Honor, it is not a mitigating factor

23   that the defendant briefly picked up trash that was brought

24   into the Capitol by the riot.  As Your Honor was able to see in

25   Exhibit 8 of the government's sentencing memoranda,

1    U.S. Capitol Police Sergeant Jason McGinniss, who was with the

2    defendant in the Crypt and ultimately had to escort him out of

3    the Capitol, explained he never told the defendant to pick up

4    trash.  Nobody did.  What he told the defendant to do was

5    leave, but the defendant did not leave.

6         You can also see in the Capitol security footage that

7    the police officers were clearing the room and people were

8    exiting back through the Senate wing door that the defendant

9    entered inside, but the defendant did not follow those people

10   instructed to leave.  He did not leave until he was literally

11   walked out of the door.

12        The defendant was a willing drop in the flood.  He was a

13   rioter.  And shouting in the Capitol in his big red Trump hat,

14   he was not a neutral observer.  At the plea hearing, in

15   response to a question from Your Honor, he admitted he was

16   there to support President Trump.

17        When he witnessed chaos in the Capitol, he did not

18   discourage it.  He joined in it.  And when he was told to

19   leave, knowing he was not supposed to be there in the first

20   place, knowing that what he was doing was unlawful, he did not

21   walk away.  He stayed in the Capitol for 20 minutes until he

22   was escorted out.  This behavior warrants a sentence of

23   incarceration.

24        The severity and nature -- the severity of the nature

25   and circumstances of this crime also speak to the strong need

1    for general deterrence in issuing a sentence.  On January 6th,

2    our institutions teetered on the brink of destruction, and now

3    the nation is watching these cases.  Meanwhile, the kind of

4    dangerous rhetoric that led to January 6th persists as we

5    approach another election.

6         This Court must send a message that our democracy is

7    sacrosanct and that those who would seek to destroy it will see

8    severe consequences for their actions, a message that violence

9    is not the answer to political frustration.

10        Specific deterrence is paramount in this case and

11   clearly supports a sentence of incarceration.  The defendant's

12   callous disregard for his actions borders on impunity.  Let's

13   start with his statements on social media.  He bragged about

14   the insurrection.  He sent his videos to dozens of friends.  He

15   said it was epic.  He even told his brother it was the best

16   rock concert he had ever been to.

17        His brother was, understandably, shocked.  He replied

18   "I've never been to a concert where four people died and a

19   woman got shot in the neck by the cops.  And I wouldn't brag

20   about it, if I was."  What was the defendant's response?

21   "Watching videos of all this now.  You should have went to this

22   one."  You should have went to this one; that's the level of

23   remorse the defendant had even after watching additional

24   footage of what happened.  He took part in an attempted coup

25   where people died and talked about it like it was all a big

1    joke.

2          In the defendant's sentencing memorandum, he explains

3    that he knew he shouldn't have been there.  But that's not what

4    he said to anybody after the fact.  Now, what I just shared

5    was -- his bragging was to his friends and his family

6    privately.  But publicly, where the defendant feared

7    retribution, he either downplayed his actions or flat-out lied.

8          On public posts on social media, he said if he was

9    there -- "if," as if it was in doubt that he was, in fact,

10   there -- he said he was there as a journalist.  Your Honor, the

11   defendant is not and never was a journalist.  He lied to the

12   FBI too.  He said he was only there to capture others

13   committing crime and would have intervened if he saw crime.

14         Your Honor, we've seen the defendant's videos, and

15   additional videos were -- are still in the -- provided in the

16   government's sentencing exhibits.  The defendant saw crime and

17   violence everywhere:  barricades removed, property destroyed,

18   trespassing through broken windows, a full-on riot.  Not once

19   in those videos do we see the defendant trying to intervene,

20   but that's the lie he told the FBI.

21         The defendant has expressed no remorse up until he pled

22   guilty.  Even now, Your Honor, the defendant's arguments in

23   their sentencing memorandum say over and over again that he was

24   not a participant and that he never encouraged others; but

25   we've seen the videos.

1        His shouts of political aims encouraged others.  When

2    someone said in the center of the Capitol, in the Crypt, "We

3    have the power," he said, "Amen."  As the other rioters took

4    over the Crypt, he hugged them; he fist-bumped them; he patted

5    them on the back.  That's encouragement, Your Honor.  That's

6    participation.  The defendant still does not seem to accept

7    that you can't join up a violent riot and then wash your hands

8    of the violence just because you weren't the most violent

9    person there.  His presence, but more than just his presence,

10   his actions and his words played a role in supporting the riot

11   that day.

12        And, Your Honor, these same points also speak to the

13   need for the sentence to promote respect for the law.  Of

14   course, the violent insurrection in which the defendant

15   participated was a direct attack on rule of law itself, but the

16   defendant's lack of remorse only emphasizes the need for a

17   lesson in respect for the law.

18        And lastly, Your Honor, turning to the notion of

19   avoiding unwarranted disparities, I'd first like to take a

20   moment to distinguish the defendant's conduct from lesser

21   conduct of other January 6th defendants who were sentenced to

22   home -- the home detention as opposed to incarceration.  The

23   defense argues in the sentencing memorandum that the

24   defendant's conduct is the least culpable of the people who

25   participated in that riot, but, Your Honor, that's not true.

1    Namely, I'd like to discuss Karegan Bostic and Meghan

2    Rutledge, who Your Honor recently sentenced.  Like the

3    defendant, Bostick and Rutledge witnessed chaos and violence

4    occurring on the west side of the Capitol.  However, Bostick

5    and Rutledge did not enter the Capitol until 3:12 p.m.; while

6    the defendant entering at 2:26 p.m. was part of the initial

7    breach that forced the evacuation of Congress.  Moreover, after

8    Bostick and Rutledge entered through the Senate wing door, they

9    stayed in the immediate area and exited voluntarily after

10   4 minutes.

11        The defendant, on the other hand, traveled deeper into

12   the Capitol where he participated in shouting and encouraged

13   other rioters and, when directed to leave by police, ignored

14   orders until he was escorted out of the Capitol.  Ultimately,

15   he was inside for 20 minutes.  His conduct was more disruptive,

16   more culpable, and it warrants a more significant sentence.

17        I'll now briefly review a few instances of more

18   comparable conduct that supported the Court's sentence in this

19   district of 30-days'-or-more incarceration, and these are the

20   cases also referred to in the government's sentencing

21   memorandum.

22        Two defendants, Philip Weisbecker -- that's

23   Case 21-cr-682 -- and Daniel Morrissey, in Case 21-cr-660,

24   exhibited similar conduct to the defendant.  Both witnessed

25   chaos occurring on the west side of the Capitol and,

1    nevertheless, participated in the riot by chanting in the

2    building, though not engaging in assault themselves.  Both took

3    to sharing photos and videos on social media where they either

4    downplayed the violence or bragged about their participation.

5    Their lack of remorse was a significant factor in leading

6    Judge Hogan to sentence Weisbecker to 30 days' intermittent

7    incarceration and Judge Walton to sentence Morrissey to 45 days

8    of incarceration, respectively.

9         In another example, Judge Berman Jackson sentenced

10   Joshua Wagner -- that's Case 21-cr-310 -- to 30 days'

11   incarceration, even without strong evidence of his lack of

12   remorse.  And this is because Wagner not only entered the

13   Capitol from the violent west side but shouted in the Crypt and

14   ignored instructions from police to leave.

15        The defendant's conduct is arguably more serious than

16   all three of these defendants who were sentenced to

17   incarceration, and that's because the defendant both took

18   additional steps to occupy the Capitol by ignoring countless

19   signs and instructions indicating that he was not permitted to

20   be there and expressed a shocking lack of remorse for

21   participating in the violent insurrection.

22        These aggravating circumstances of the defendant's

23   violation of 40 U.S.C. 5104(e)(2)(G) thus warrant, at minimum,

24   a similar sentence of incarceration to these defendants.

25        For these reasons, Your Honor, the government requests

1    that the defendant be sentenced to 30 days' incarceration,

2    3 years' probation, 60 hours of community service, and $500 in

3    restitution.

4              THE COURT:  All right.  Mr. Ohm.

5              MR. OHM:  Thank you, Your Honor.

6         Good afternoon.  I first wanted to begin by

7    acknowledging Mr. Vogel's father, Troy Vogel, who's in the

8    audience -- came down from New York to support his son.

9              As the Court knows, we're asking for a sentence short of

10   incarceration.  We're asking the Court to follow probation's

11   recommendation and allow Mr. Vogel to continue to work in the

12   community and also as a reflection not of what happened in the

13   first month in January -- of January of 2021, but of all of

14   the -- all of what's happened since then; which is that

15   Mr. Vogel has been entirely compliant with the Court's

16   conditions.

17             He's been to every court date.  He hasn't been ever

18   late, and he -- either in in-person court or in virtual court.

19   He has not had a single infraction.  He's been inordinately

20   compliant; making sure even if he's not getting phone calls

21   through to pretrial service representatives, that when he

22   travels out of state, that he -- that he emails them.

23             He -- he's a -- he's a young man who works between 60

24   and 80 hours a week, and he just started a new job a few weeks

25   ago when -- and a term of incarceration, as the government

1   suggests, would -- would be -- very likely would mean that he

2   would lose his job.

3           THE COURT:  Is that the T-h-u-e-s-o-n company or a

4   different one?

5           MR. OHM:  I believe that that was accurate at -- at

6   the time of the presentence report, but as --

7           THE DEFENDANT:  I'm not anymore.

8           MR. OHM:  -- as of a month ago, he switched jobs.

9           THE COURT:  Okay.  So he has a new job in the same

10  area, I guess, in terms of where he's living?

11          MR. OHM:  That's correct, Your Honor.  That's

12  correct.

13          THE COURT:  And the reason for the switch, that you

14  know?

15          MR. OHM:  It was a better and more stable opportunity

16  and not -- and less dependent upon the kind of business that --

17  that -- the business that the business was getting, if that

18  makes sense.

19          THE COURT:  Okay.

20          MR. OHM:  Your Honor, we don't -- I just want to

21  remind the Court, Mr. Vogel pleaded guilty here.  So to the

22  extent that -- a substantial part -- portion of the

23  government's allocution, I think, would -- would be more

24  befitting of a closing argument where Mr. Vogel was disputing

25  what happened.  Certainly, January 6th was a terrible thing,

1   and, certainly, it is not something that Mr. Vogel forgets or

2   any one of us forgets.

3         It was a terrible occurrence.  But in the last couple of

4   years, I think it's been my job and the Court's job and the job

5   of a lot of folks in this courthouse to sort of pick apart the

6   different factual things that individuals did.  And it made

7   sense.

8         You know, the government was very supportive of that

9   analysis up until recently with these misdemeanor cases, and I

10   would submit to Your Honor that one of the main reasons is that

11   all of a sudden the arguments that the government had been

12   making don't fit.

13         So now we talk about and we spend substantial time

14   talking about how Mr. Vogel knew that something chaotic was

15   going on.  There has never been any dispute in any single one

16   of these cases -- I don't think a single person would walk into

17   this courthouse and say I didn't know it was chaotic over at

18   January 6th.  But every single defendant here, that -- that's

19   something that applies to every single one of them.

20         And now we're talking about fist bumps and pats on the

21   back with individuals who are walking back.  And it's sort of

22   this straw-man approach that the government is taking, that is,

23   I would submit, trying to cloud and muddy the issues for

24   Your Honor.  He didn't pat on the back Thomas Webster, the

25   officer who was convicted and given 15 years for assaulting

1   somebody, seeing what he did.

2          He patted on the back other individuals who were

3   engaged in exactly the same conduct as him, other people who

4   were charged with misdemeanors and pleaded guilty to

5   misdemeanors.  And there's no evidence on anything that the

6   government showed you that he went out of his way to encourage

7   anybody who was doing anything except walking around or

8   shouting or protesting.

9          So this attempt to sort of take Mr. Vogel in the

10  category that he's been in -- that he clearly has been in, that

11  the government has identified him in, by offering him -- first

12  charging him with misdemeanors and then offering him a plea to

13  parading, which is not something that they do with everybody --

14  to try to bring him into a different category, a felonious

15  category, a coup attempter, which would, we all know, mean that

16  he would have a 1512 charge on top of that.  Or somebody who is

17  obstructing with the police, we all know he would have had a

18  231 charge on top of that.

19         I'm not here to say, Your Honor, that he -- it's a

20  mitigator, but I am trying to say, let's not try to confuse the

21  different lines that have been drawn so carefully, we had

22  thought, by the Department of Justice and the Attorney General

23  and now try to group everybody in because that's more

24  beneficial to the government's argument.

25         It's simply not fair.  And it's not the way the

1    Department of Justice should proceed on these cases.  The

2    government had very reasonably begun these cases with a rubric.

3    And I -- I mention it on part -- on page 8, but it's a

4    paragraph I saw in every single one of my sentencing memos in

5    my first year.  And they talked about the different factors

6    that the Court should consider when sentencing individuals

7    within the context of the same crime that they were charged

8    with or convicted of or pleaded guilty to.

9         And those factors are -- and there's no -- nothing has

10   changed now, except that maybe we have more vigilant

11   prosecutors who want to make greater arguments or more

12   arguments.  But we have the Court -- and this is, again, taken

13   from, I want to say, at least six sentencing memoranda that my

14   clients have received from the government.

15        Additionally, while looking at the defendant's

16   individual conduct, we must assess such conduct on a spectrum.

17   This Court, in determining a fair and just sentence on the

18   spectrum, should look to a number of critical factors to

19   include:

20        One, whether, when, how the defendant entered the

21   Capitol Building.  Well, we know that Mr. Vogel walked through

22   the doors.  And so what the government typically argues is when

23   somebody climbs through a window, especially if they break a

24   window, then -- or if they're pushing against police or there

25   are police there, resisting, that that should be an aggravating

1    factor.  Mr. Vogel did none of those things.  He walked through

2    a door.

3         Number two, whether the defendant encouraged violence.

4    Mr. Vogel was not encouraging violence in any way.  And so as

5    the government now comes in here and shifts that standard to

6    whether he was encouraging other, really, protesters -- because

7    that's what they have evidence of.  But they're calling them

8    rioters now.  And there is no evidence of violence in any of

9    the videos.

10        It's chaos; 100 percent.  There's yelling; 100 percent.

11   But if the Court looks carefully at the language that the

12   government uses, they're now shifting to whether he hears calls

13   for violence, not whether he witnesses violence or witnesses

14   destruction.

15        And then they take a -- an innocuous chant like "Take it

16   back," which everybody heard -- I know the Court has seen way

17   too many of these videos, just like I have.  I mean, there was

18   a lot of "Take it back" chanting throughout the course of this.

19   And one thing that's clear is that Mr. Vogel was actually not

20   one of the people chanting "Take it back."  That is very clear

21   from his social media posts that the government is entirely

22   relying upon.

23        Number three, whether he encouraged property

24   destruction.  No evidence of that.  And so now, again, the

25   government shifts and says, well, he saw property destruction

1      and he didn't leave.  Well, Your Honor, that is true of every

2      single person who's in this courthouse facing -- facing these

3      charges and having pleaded guilty to these charges.  His

4      reactions to acts of violence or destruction, I think the Court

5      can tell by omission, but also through the statement of facts,

6      he wasn't present or around in -- any of the acts of violence

7      or destruction.

8             Number five, whether during the riot or after the

9      riot --

10            THE COURT:  Well, he could look at the scaffolding

11     and watch the scaffolding coming down in terms of -- which

12     allowed them to go in.  That certainly was destructive.  I

13     mean, he didn't do it.  He benefited from it because it opened

14     up the staircase.  But he certainly witnessed it.

15            MR. OHM:  Your Honor, the scaffolding came down.  I

16     don't think that --

17            THE COURT:  Yes, they pulled it down, as you saw in

18     the video, and it indicates the staircase, which nobody knew

19     about -- once you pull the scaffolding.  And that didn't have

20     the security, and that's one of the staircases that they all

21     went up, including him.  Now, he did not pull the scaffolding

22     down.

23            MR. OHM:  And he didn't encourage it either.  And,

24     Your Honor, his reaction to seeing individuals inside was WTF.

25     That was what -- I mean, he didn't -- I mean, he is reacting as

1    things are happening.  It wasn't a, oh, go.  They're in there.

2    It's time for us to go -- which we have seen in a lot of these

3    other -- in a lot of these other cases.  His reaction was a

4    surprising, like, oh, my goodness.

5         And I don't think -- the government is saying that he --

6    that it was a complete lie because he was saying he was a photo

7    journalist, and I know that -- and that -- obviously, if that

8    were the case, that would be our defense.  We're not saying

9    that as any particular -- saying that Mr. Vogel was -- is

10   correct or trying to minimize his actions in any way.

11        But if the Court notices throughout that, there's -- he

12   doesn't talk.  And it's more -- when I watched that video, it

13   struck me that it was more akin to, like, the political videos

14   that we've seen, some of the other media videos that we've

15   seen, because I think the -- and he has said to me that the --

16   the mindset, at least for a period of that time, was to record

17   what was happening.  Now, clearly, he does say a couple of

18   things.  And so that mindset wasn't there the entire time, but

19   that is what he was referring to when he had those

20   conversations.

21        Number seven, his statements in person or on social

22   media.  There were no statements in person.  There were some

23   statements in social media.  I -- I dispute the government's

24   characterization that his public statements on social media

25   should be an aggravator.  Certainly, if Mr. Vogel was saying

1    that he was there, the government would be coming in here

2    saying that he was bragging to the public about his role in

3    January 6th.  I mean, it's really one of those things where the

4    government really can't have it both ways.

5         Number eight, whether the defendant cooperated and/or

6    ignored commands from law enforcement officials.  So this --

7    Mr. Diamond really makes a big deal out of this.  And I think

8    if the Court reviews the video again and actually reviews

9    carefully what the officer said, that that -- it's not what the

10   government wants the Court to believe it is.

11        The statement from the officer very clearly, number one,

12   says that he did not recall any interaction with Mr. Vogel.

13   Mr. Vogel is one of the most recognizable people on January 6th

14   because his hat is so big.  I mean, it's bigger than this

15   podium.  And he has no recollection of that.  So for the

16   government to ask the Court to draw an inference to say that

17   that's what happened, well, the government should have brought

18   that witness in because it's not what he said.  What he said

19   was precisely the opposite.  He doesn't recall any

20   interactions.

21        And then the government sort of brings us --

22             THE COURT:  Are you indicating that I should ignore

23   what the sergeant said?  Is that what you're saying?

24             MR. OHM:  Well, no.  The Court should credit what the

25   sergeant says, is that he does -- he did not recall any

1    interaction with Mr. Vogel.  So he didn't -- there's no

2    evidence before the Court that Mr. Vogel was asked to leave.

3         And the one officer that the government brought you said

4    in his notes that he did not recall any interaction with him

5    when -- which is, obviously, an honest statement.  And given

6    the fact that Mr. Vogel is so recognizable, that that -- that

7    is evidence, Your Honor, of exactly the opposite of what the

8    government is trying to get the Court to believe.  There's no

9    evidence.  There would be an officer who would say I tried to

10   get him to leave if it was what the government was trying to

11   say it was.

12        THE COURT:  There was some -- well, I'll wait until

13   the government responds, but go ahead.

14        MR. OHM:  Sure.

15        The other -- the other aspect is then the government is

16   saying, well, you know, he wasn't told to pick up garbage.  The

17   garbage -- the picking up of the garbage did not happen at the

18   Crypt.  It happened at memorial hall.  Memorial hall is a

19   different place.  So the two things don't connect.  That

20   officer not saying anything about picking up garbage has

21   nothing to do with Mr. Vogel and his intentions and what he was

22   doing when he decided that what he was -- what he was starting

23   to process that he was part of was something that he shouldn't

24   be part of and something that he wanted to correct, even if it

25   was in a minimalist way.

1          What we're talking about isn't -- I'm not saying,

2     Your Honor, that picking up garbage means that -- that the

3     sentence should be less because he picked up garbage and he

4     saved somebody from picking up garbage.  What I'm saying is it

5     does demonstrate, I think indisputably, the state of mind

6     Mr. Vogel had during the last moments that he was in the

7     Capitol.  And if you look at the video also, he then is told to

8     leave and he leaves.  That happens at that point.  And you can

9     see the officer pointing, and then you can see him just walking

10    down.

11         THE COURT:  Are you indicating that an earlier

12    encounter with him when it appears that they're -- there's some

13    conversation in terms of -- and they're trying to get people

14    out and he stayed, are you saying that didn't happen?

15         MR. OHM:  I am saying that that wasn't a conversation

16    telling him to get out, and there were other people that were

17    walking around --

18         THE COURT:  So he was having some other conversation

19    with the officers, even though the officers are trying to get

20    everybody else out?

21         MR. OHM:  They weren't, though.  If the Court looks

22    with a -- sort of a different eye -- and I can show it.  I

23    think I have it here.  There was an initial move to get people

24    out, and then there are about 15 to 20 people who were standing

25    around, and the officers just sort of leave them there.  And

1    from my perspective, it seems pretty clear that Mr. Vogel is

2    waiting for somebody, but --

3             THE COURT:  This is the first encounter you're

4    talking about or the second encounter?

5             MR. OHM:  I believe -- I think the Court is --

6             THE COURT:  The government counsel is shaking his

7    head.  So I don't know whether we're at the right encounter or

8    not?

9             MR. OHM:  I think it was --

10            THE COURT:  Excuse me.  To make sure we're talking

11   about the same one --

12            MR. OHM:  Sure.

13            THE COURT:  -- from government counsel, is this

14   the -- where you indicated that he was told to leave initially?

15   Is this the one or not.

16            MR. DIAMOND:  No, Your Honor.  That's shown at a

17   different time and from a different camera angle in the Crypt.

18            MR. OHM:  What exhibit?

19            MR. DIAMOND:  That is going to be Exhibit 7.  Give

20   me -- I'm just going to read exactly what time it is.  That's

21   Exhibit 7 at about 2:36 p.m.

22            THE COURT:  And this is the one where you're

23   indicating you think he's being asked to leave?

24            MR. DIAMOND:  Yes.

25            MR. OHM:  So, Your Honor, as the Court can see from

1    about 4 minutes before that -- or 8 minutes before that, the

2    Crypt is full.  And Mr. Vogel isn't there at that point in

3    time.  So the officers, presumably, are asking people to leave,

4    or they're making efforts to clear people out.

5                    (A video recording was played.)

6                    THE COURT:  Well, wasn't he there at one point?

7                    MR. OHM:  So he -- so he eventually comes in.  Okay.

8    And the Court, I think, can see him here.

9                    THE COURT:  Okay.

10                   MR. OHM:  This is, I believe --

11                   THE COURT:  There he is.  Okay.  On the left.

12                   MR. OHM:  If the Court can see, he sticks around by

13   that one particular statue for a while looking at his phone.

14                   (A video recording was played.)

15                   THE COURT:  So from the government's perspective, is

16   this the one where, supposedly, the officer came up?

17                   MR. DIAMOND:  You're going to see that in just a

18   moment, Your Honor.  You can see the officer pointing out, now

19   going up to Vogel, and, again, he's going to point -- point

20   out.

21                   MR. OHM:  Your Honor, I mean, if the record --

22                   THE COURT:  Well, he pointed at one -- when Mr. Vogel

23   is around.  Now he's pointing to some of the others.

24                   MR. OHM:  I mean, I don't -- the -- there are enough

25   people around where I think it's very unclear that the

1   conversation was with Mr. Vogel, the direction of Mr. Vogel,

2   but he talks to the person in the --

3          THE COURT:  Well, leaving aside conversations, I'm

4   looking at movements.  I mean --

5          MR. OHM:  Sure.

6          THE COURT:  -- there he's -- one officer is pointing

7   him to go out.  He had pointed earlier with Mr. Vogel to go in

8   the direction of the door, presumably, suggesting that they get

9   out.

10          MR. OHM:  So there we saw the officer talk to the

11   person in the white helmet and point.

12          THE COURT:  Okay.

13          MR. OHM:  And then he walks by Mr. Vogel and then

14   talks to somebody else at the bottom of the camera and points.

15          THE COURT:  Okay.  So which -- is there something

16   that -- just so I don't have to see this twice.  What is it

17   that the government is seeing in terms of he's being

18   specifically -- even if we don't know the conversation -- to

19   assume that he's being asked, like the rest of them, to leave?

20          MR. DIAMOND:  Sorry, Your Honor.  Was that a question

21   directed at me?

22          THE COURT:  I'm sorry?  I'm trying to figure out --

23   so I don't have to see this twice -- where in the video --

24   leaving aside what they might have conversed about, where the

25   officer comes up.  Is -- you're indicating -- indicating he

1    should be leaving and he stays around.  He clearly stays around

2    when most of the people are gone.  But where is it that,

3    supposedly, he was told -- or there was some conversation he

4    was told to leave?

5              MR. DIAMOND:  Your Honor, the government submits that

6    that happens at 2:36 p.m., and that's when that officer first

7    approaches him and points -- points out the door.

8              THE COURT:  Okay.  So can we go back to that?

9              MR. OHM:  Do you have a second?

10             THE COURT:  So what is it?  It's 2 what?

11             MR. DIAMOND:  I believe 2:36 p.m.  And we're at 2:36

12   and 27 seconds.  I think it's at 2:36 on the dot.

13             MR. OHM:  On the dot.

14             (A video recording was played.)

15             THE COURT:  Okay.  There's 2:36.

16             MR. OHM:  So, Your Honor, I think it's -- I think

17   it's very clear that he's talking to the person in the white

18   and then that person leaves.

19             THE COURT:  I'm sorry.  I can't hear you.

20             MR. OHM:  It seems clear to me that he's talking to

21   the person with the white hat or helmet and then that person

22   leaves.

23             MR. DIAMOND:  Your Honor, I have a few further

24   comments about this.  I'm happy to wait until --

25             THE COURT:  Okay.  Let me let you finish, Mr. Ohm,

1    and not interrupt it with bringing the government in.  So go

2    ahead with your allocution.

3              MR. OHM:  I think Your Honor, at best, can say that

4    this is unclear, but it does seem like he's pointing -- that

5    the officer is pointing to somebody else, and that officer

6    then -- then comes and points to the people at the bottom.  The

7    record, I think, is murky, at best, from the government's

8    perspective.

9         And then it also actually fits well within what the --

10   the officer said, which is that he didn't -- he remembered

11   going around telling people to leave, but he didn't remember

12   the person in the red hat and doesn't remember having any

13   interaction with him, so.

14        And if, Your Honor -- if the -- if this Crypt was empty

15   at the time, then I think the government could raise a stronger

16   point.  And as the Court can see, there are other individuals

17   who are standing around that are being left and aren't being

18   told -- or I don't know if they're being told to leave or not,

19   but there's people standing around.  And you don't see anybody

20   telling Mr. Vogel to stand around.

21        So for the government to say that he refused to

22   cooperate is just -- is just a stretch and not supported by the

23   record in this case.

24        And, again, the reason the Court is -- the government is

25   hammering that point is because that's the only thing that they

1    have that makes Mr. Vogel any different than any of the -- and,

2    Your Honor, I counted for a case a few weeks ago -- I'm going

3    to stop because I think the government agrees that there's no

4    other interaction.  Where I counted -- and I think the

5    government counted also -- is in *United States v. Jason*

6    *Gerding* -- that over half of the individuals charged with

7    parading have received straight probation, not even home

8    incarceration.

9         So individuals who did do all of the things that the

10   government is talking about in terms of witnessing, sirens,

11   hearing chanting, hearing people talk about chaos or talk about

12   even violence -- and people who did much more than that,

13   engaged in the chants and had much more, I'll say, offensive

14   social media posts after the fact, that those individuals all

15   received straight probation.

16        And the government, when they cite to the -- the cases,

17   they -- they certainly -- they just don't fit in terms of what

18   they're trying to present.

19        The *Weisbecker* case that Mr. Diamond mentioned, he went

20   into Speaker Pelosi's suite.  That is one of the things that

21   the government has repeatedly argued, that when an individual

22   goes into a sensitive area, that is an aggravating factor where

23   they should be punished.  And that is exactly the argument that

24   they made to Judge Hogan, and that is one of the reasons that

25   that person got 30 days.

1    That individual also was seen verbally abusing police

2    officers at -- on January 6th at the time calling them traitors

3    and calling them tyrants.  I'm sorry.  The traitors and tyrants

4    was Mr. Wagner, which is another case that --

5         THE COURT:  You need to slow down.  You're going way

6    too fast in terms of the court reporter.

7         MR. OHM:  Sure.

8    The -- and Mr. Wagner, who also, I believe, got 30 days,

9    also referred to AR-15s and wondered out loud why AR-15s hadn't

10   been brought there, which is an indication of the state of mind

11   of Mr. Wagner, which is also what the government argued to

12   justify jail time.

13   Mr. Vogel, on the other hand -- and, look, Mr. Vogel

14   completely acknowledges and understands that if he and others

15   like him weren't there, regardless of whether he said anything

16   or didn't or said a couple of things, that this -- the

17   likelihood that this -- what the -- the seditious conspirators

18   were doing, the likelihood of that succeeding would have been

19   much less.  He knows that.

20   And he is deeply sorry, particularly to the

21   Capitol Police officers, who he knows must have felt

22   overwhelmed because, as he and I have talked many times, it's

23   not like the officers could see the difference between the

24   people who wanted to protest and ended up inside versus the

25   people who wanted to overthrow the government, and that he was

1    that threat to all of those officers.  He understands that, and

2    he is ashamed of that because he is a law enforcement person.

3          In fact, one of the things that the government failed to

4    mention in his conversations with the -- with his brother after

5    January 6th was an argument that he had with his brother who

6    said -- who's accusing the officer who shot Ashli Babbitt of

7    police brutality.  He said, "This is an easy case of police

8    brutality, the way I see it."  And Mr. Vogel said, "They went

9    way too far.  They were" -- I don't want to misquote him.  He

10   said they --

11         THE COURT:  Who's the he?

12         MR. OHM:  Mr. Vogel.  His brother said, "It's a clear

13   case of police brutality."  And Mr. Vogel said, "I mean, they

14   popped through the chamber.  What the F were they thinking?  I

15   mean, that's like 12 barriers you went through."

16         Clearly, Mr. Vogel was saying those people put

17   themselves in danger and the officers had to respond

18   accordingly.  He was condemning them.  So I know it's not

19   convenient for the government's argument to look through and

20   just -- I mean, they highlight these portions.  But there are

21   other portions where Mr. Vogel in this private conversation

22   with his brother, who is criticizing him for his actions, it's

23   a genuine statement where he is telling his brother those

24   officers didn't do anything wrong.  It was the rioters who went

25   up there that did something wrong.

1       And that -- the way that the government is saying that

2   that -- those text messages, those changes are indicative of

3   Mr. Vogel's state of mind, we agree.  That was his state of

4   mind.  He did what he did.  And at that time, Your Honor, I

5   will say this:  None of my misdemeanor clients right afterwards

6   appreciated or processed the fact of what -- how they

7   contributed to the particularly bad actors.

8       And I would submit that largely the reason is, is that

9   folks like Mr. Vogel became the poster child of January 6th and

10  everybody was calling them traitors.  I can show the Court

11  social media posts where literally people in his community are

12  calling them fascists, called them traitors, calling them

13  insurrectionists.  And that wasn't what he intended.  That

14  wasn't what he was part of.

15      I mean, a lot of this is about I had -- this violence

16  isn't me.  And so there was a lot of pushback for all of these

17  individuals.  The -- the come-to-Jesus moment came a little bit

18  later when they realized after hearing the officers start

19  talking on media about what they were experiencing, realizing

20  then that:  Wow.  Okay.  I was part of this in some way, even

21  though I had no intention of being part of this.  And that is

22  exactly where Mr. Vogel was coming from.

23      And, Your Honor, if the Court looks at his -- his

24  history and characteristics, the Court will see a good man,

25  somebody who will not turn against his government and start a

1    coup or an insurrection.  He's a man who has been inordinately

2    respectful of this Court's order.  He's a man who's never been

3    in trouble before.  He's a man who works very hard, and he's a

4    man who, members of his community say, give -- gives as much as

5    he can.

6         Now, I can tell the Court just from interacting with him

7    that he's working all the time.  But when he's not working for

8    money, he's working to help.  And because he's not a

9    particularly rich person, what he does is he assists in what he

10   knows.  When people have -- when people who are less fortunate

11   and can't afford plumbing jobs and he thinks he can fix it,

12   he'll go and he'll fix it.  That's the kind of person that

13   Mr. Vogel has been.

14        Again, Your Honor -- and I know that the fact that

15   Mr. Vogel inside -- I think the Court can trust that everything

16   that individuals who are inside the Capitol say is ultimately

17   caught by the U.S. Attorney's Office.  They're very good at

18   that.  And the only things that he said during the time that he

19   was in there was "Amen" and "Let this be a warning to the

20   communist party."

21        And I would just point out, Your Honor, that those are

22   not comments that have anything to do with taking the Capitol,

23   stopping the vote, making sure that President Trump is going to

24   be President.

25        And I will ask the Court to note that there were a lot

1    of people there who were just protesting what they were told

2    was a false election but did not go that unusual and

3    insurrectionist step of saying that what they want to do is

4    make sure that the government -- that election was overturned

5    or that -- that -- that President Trump should remain in power.

6    There were people with completely different mindsets.  And

7    despite the government's best efforts, I think it's very clear

8    that Mr. Vogel is there to protest.

9         The Court actually asked him that, and it caught us off

10   guard.  I remember during the plea colloquy, the Court asked

11   Mr. Vogel whether he was there to change the election results

12   or was he there because of the certification.  And he honestly

13   said no.  In the middle of the guilty plea, where he didn't

14   have any time to think about it, he just gave his honest

15   answer.  There was no advice from counsel.  If I had time to, I

16   probably would have at least thought about objecting just in

17   case.  But that's how Mr. Vogel's approach has been throughout

18   all of this.

19        Court's brief indulgence.

20        Again, Your Honor -- and I cited a number of cases,

21   including cases -- sentences provided by this Court.  But I

22   think -- I -- I agree with the government that it is important

23   to show the country and the world that January 6th is a day

24   that cannot be repeated.  But I also think that the government

25   needs to be mindful of fairness across the board.  I know

1    Your Honor has actually taken great efforts to make sure

2    the sentences match up; that they make sense in relation to

3    other sentences.  And I know that's something important to the

4    Court.

5          The unwarranted sentencing disparity aspect is always

6    important.  But in a case where the media or certain aspects or

7    certain people are trying to politicize what happens in these

8    courtrooms, it's -- it's inordinately important.  It's

9    important that we -- that the country does not feel like

10   there's arbitrary sentences given to individuals who have done

11   essentially the same things.

12         So I ask the Court to seriously consider all of the

13   evidence of -- of Mr. Vogel's intent, which is demonstrated, if

14   nothing else, during that time frame in our exhibit.  And I

15   would note there that he interacted with a couple of officers,

16   and they just moved out of the way so he could continue to

17   help.

18              (A video recording was played.)

19              MR. OHM:  And there, Your Honor, he appears at the

20   bottom of the screen.  The camera didn't catch what he was

21   doing, but I would submit to the Court that he was continuing

22   to clean up, and then an officer comes and tells him for the

23   first time to go.  And then what does he do?  He leaves.

24              (A video recording was played.)

25              MR. OHM:  And, Your Honor, that -- it wasn't a second

1   or two.  It wasn't one piece of garbage or two.  I mean, this

2   is -- this is what he was trying to do in that moment to make

3   things right.

4          Now, the government is right; he didn't tell anybody to

5   leave.  Nobody really did.  I mean, the officers did.  Not

6   successfully.  He didn't stop anybody, but there was no real

7   violence in front of him.  It wasn't like he was going to be

8   able to stop what was going on with the scaffolding.  But we

9   are not disputing any of the things -- he pleaded guilty and

10  admitted to a crime for the first time in his life because he

11  knows he did something wrong.

12         But he has been under supervision for two years, and

13  he's demonstrated his respect for the Court and for the

14  government for the last two years.  A period of probation will

15  allow him to do that.  And the question is does it make sense

16  to take this person, get him fired from his job, incarcerate

17  him based upon what he's done, based upon the fact that -- I

18  actually saw other clients of mine who were in these videos who

19  received misdemeanor sentences.

20         In light of the fact that we have come up with a system,

21  the government -- the prosecution has come up with a system to

22  assess these cases and determine who it is that should be going

23  to jail and who shouldn't be, when we have all of these data

24  points as to what is fair within the spectrum, it is -- it is

25  problematic to sort of shift tracks and get to a different

1    spectrum at this point in time, either because there's an

2    election coming or either -- because the government decides

3    to -- they've hired a whole new group of prosecutors who are

4    more vigilant and feisty about the kind of time they want to

5    get.

6         Mr. Vogel is among the least culpable.  He is definitely

7    culpable, and we're not minimizing that.  But the fact remains

8    that he is among the least culpable.  He said maybe 12 words

9    while inside the Capitol.  He didn't tell anybody to do

10   anything.  He wasn't around any of the violence.  And he even

11   picked up trash when he realized that what he was doing -- what

12   he was part of was something that he did not -- that he wanted

13   to start and try and fix.

14        He completed that by pleading guilty, and he's

15   completing that here before Your Honor.  But I would ask the

16   Court to give a sentence -- a fair sentence; a sentence that is

17   consistent with all of the other sentences, consistent with the

18   factors, consistent with who Mr. Vogel is as a person, and the

19   fact that he is -- he's never been convicted of anything and

20   he's only been compliant with the Court.

21        And so we'd ask the Court to give him a sentence short

22   of incarceration, a probationary sentence.

23        If the Court has any other questions, I'd be happy to

24   answer them.

25             THE COURT:  I don't have anything.  Let me look at my

1    computer.

2        All right.  I saw the government shaking their head.

3    There are a few things -- points before I ask Mr. Vogel so we

4    have everything and he's heard from everybody before he -- if

5    he wishes to address the Court.

6        But I don't need to hear what you've already said.  If

7    you're making points that you disagree with, then indicate what

8    it is.

9        MR. DIAMOND:  Yes, Your Honor.  I just want to -- I

10   just wanted to clarify in particular what we're talking about

11   regarding the -- the instructions to the defendant to leave,

12   because they are significant.

13       THE COURT:  So this is the first time you claim he

14   was asked to leave?

15       MR. DIAMOND:  Yes.  And, you know, Your Honor, this

16   is -- this is a situation where -- where one plus one equals

17   two.  And here we have what is very clearly an officer pointing

18   out of the Crypt towards the way the defendant came, and the

19   defendant is looking right at him.  It is -- it is clear that

20   someone is pointing the way to go.

21       Now, we watched a lot of this video and the defendant

22   remaining after the officer's pointing to other people.  You

23   know, despite the -- despite the defense counsel's statement

24   that the government has -- you know, can find any word that

25   everybody says in the Capitol, that's not true.  This -- the

1    security footage where we have that clear picture of an officer

2    pointing out, we -- we don't have audio.  We don't know what's

3    said, but we can infer that pointing the defendant out the door

4    and the way that other rioters had been going was an

5    instruction to leave.  That's one side of the equation.

6        And, Your Honor, I do actually want to visit briefly

7    Exhibit 8, which is the statement of U.S. Capitol Police

8    Sergeant McGinnis because this is the other side of the

9    equation.  Now, the -- defense counsel is correct.  This

10   sergeant did not specifically remember the defendant.

11       But this is what he said:  He did not remember

12   interacting with William Vogel.  However, he specifically

13   recalled that at the time and location the video was taken --

14   and that -- video are the exhibits that we've seen -- when he

15   and other police on the scene were telling single persons and

16   small groups of people to leave the building via the nearby

17   exit doors, McGinnis and other police personnel at the time

18   were standing in the aforementioned area until all or almost

19   all unauthorized persons were removed.

20       It was explained that due to high radio volume the

21   officers in this area had no knowledge of what was occurring in

22   all areas of the building; and, therefore, their priority was

23   to stay in the Crypt until all of the unscreened trespassers

24   were dispersed.  Furthermore, McGinnis was resolute to make

25   sure none of these individuals were allowed to access the

1    second floor of the building via nearby stairs.

2         When asked, McGinnis affirmed that no trespassers were

3    told or asked to pick up garbage; and, furthermore, that

4    personnel unseen preferred all these subjects to leave the

5    building as per repeated orders.

6         So, Your Honor, we have a silent security footage video

7    of officers clearly pointing the defendant and other people to

8    leave.  And here we have the words of one of those officers who

9    was there explaining that all of the officers in the area were

10   trying to get people to leave.  One plus one equals two.  We

11   don't have a sound video of the officers telling them to leave,

12   but at 2:36 p.m., 9 minutes before the defendant actually left,

13   he was told to leave, and he did not.

14        And I think it's important that that's clear for the

15   record because, as with everything that happened, when the

16   defendant was in the Capitol, even though we -- the defense

17   continues splitting the defendant from the context of the riot

18   he was a part of, at that time those officers did not know what

19   was going on elsewhere in the Capitol.

20        But -- but elsewhere in the Capitol, congresspeople were

21   being evacuated as more violent people, that the defendant

22   entered the Capitol with, were seeking to harm members of

23   Congress.  And these officers could not leave the defendant

24   because he wouldn't leave the Capitol.  The words of

25   Sergeant McGinnis were that there were stairs near where the

1    defendant was that were -- gave access to sensitive areas of

2    the Capitol, and he could not go and help the other officers in

3    more critical parts of the Capitol until everybody, including

4    the defendant, was out.

5         The riot happened, and everything the defendant did

6    existed in this context of what was happening elsewhere in the

7    Capitol.  And as much as -- as we point that -- to the

8    defendant as not being one of the more violent people, it's

9    important to understand that at the time he was told to leave

10   and did not leave, violence was happening elsewhere.  And these

11   officers who were trying to get him out the door were unable to

12   help repel violence elsewhere because of the defendant's

13   actions.

14        And, Your Honor, a lot of -- a lot of things were said

15   about -- characterizing the government's aim and what the

16   government is doing here.  Your Honor has seen a lot of these

17   cases, and so Your Honor knows we're not charging the defendant

18   with -- with obstruction, which is a 20-year felony, even

19   though the defense has made arguments that we're equating the

20   defendant's intent to that.  That's not what we're doing.

21        He pled guilty to -- to a misdemeanor, and we know

22   that -- and we're not equating it to a felony.  Other people,

23   where there is proof of an intent to impede the election and

24   overturn it, they're being charged with a more -- a more

25   serious felony.

1          And maybe I'm saying too much, but I -- I do not like

2     personally being -- being characterized as -- as, you know,

3     overprosecuting this case.  It's actually pretty uncommon for

4     the office after making a plea offer to -- to a misdemeanor and

5     that being rejected and then on the verge of trial, just a

6     month before trial, giving that same exact plea offer.  That

7     this is not -- this is not an aggressive prosecution above and

8     beyond what we're doing elsewhere, actually.

9          I think that was a very -- a very generous and fair

10     resolution of the case, to let the defendant plead to the

11     same thing he was offered a year and a half earlier three

12     weeks before trial.  And I -- I won't go into the facts

13     again, Your Honor.  I stand by what -- what I've said and

14     the comparisons to other less culpable conduct and similar

15     conduct.

16          THE COURT:  All right.  Mr. Vogel, you can -- I'm not

17     going to have a back-and-forth.  Okay?  You decided to push on

18     the -- on the government.  They've had their opportunity.  What

19     are you bringing up?

20          MR. OHM:  I just -- because he said -- the government

21     said some things like the record needs to be clear.  I just

22     want to -- the Court to watch 3 seconds before the point

23     where -- where I think it's very clear that the officer is

24     talking to somebody other than Mr. Vogel.

25          THE COURT:  I can see.  I've looked at this, you

1   know.  I've had an opportunity to --

2            MR. OHM:  So 2:35 and 57 seconds is where it begins.

3   I also did want to point out, though, Your Honor, that even

4   10 minutes after Mr. Vogel leaves, there are definitely other

5   individuals, civilians, who are walking around the Crypt.  So I

6   don't -- I don't -- the -- the idea that they were completely

7   cleared out or Mr. Vogel somehow, like, prevented other

8   officers --

9            THE COURT:  It took a lot of time.  And I've watched

10  enough of them in terms of they're making decisions about who

11  they were going to push out and who they weren't.  They,

12  obviously, all wanted everybody out of there, and it took them

13  until 8 o'clock that night to get everybody out.  I think --

14           MR. OHM:  I'm just responding --

15           THE COURT:  -- they, obviously, made choices about

16  whether they wanted to confront people or not.

17           MR. OHM:  Sure.

18           THE COURT:  Okay.  If Mr. Vogel wishes to address the

19  Court, he can.  He doesn't have to.  But if he wishes to, he

20  can.

21       You can take your mask down so I can hear what you're

22  saying.  Move the microphone over so -- there you go.

23           THE DEFENDANT:  Yes.  Thank you, Your Honor.

24           THE COURT:  All right.

25           THE DEFENDANT:  I just wanted to tell the Court that

1     I am -- condemn violence of all forms, including on that day.

2     I support our law enforcement and Capitol Police.  And in

3     retrospect, I apologize, and I wish I'd used better judgment

4     and not demonstrated in the Capitol Building on January 6th.

5             Thank you, Your Honor.

6             THE COURT:  All right.  Okay.  What I'd like -- did

7     he have something more?

8             MR. OHM:  I didn't know if Your Honor would --

9             THE COURT:  What I'm going to do is I'm going to take

10    a break.  I want to go back and consider what's been said, and

11    I'll come out and do the sentence.

12            So let me -- let me look at the time.  Okay.  It's --

13    mine says 2:25.  I'll make it 2:45 so I have enough time if I

14    need to go back and look at the video.  So I'll see you back --

15    you can step out, if you wish, but just don't go too far

16    because we need to come back.

17            (Recess taken.)

18            THE COURT:  It took longer than I expected to go over

19    my notes and to review parity in terms of other sentences that

20    I've imposed.

21            So proceeding, the Court considers the pleadings,

22    arguments, and record in this case, in addition to the

23    following information, in determining a fair, appropriate, and

24    reasonable sentence in conformance with factors set out in

25    18 U.S.C. 3553(a) and subsequent sections, except for (e).

1     Mr. Vogel is 29 years old.  And, in fact, it's your

2     birthday today; right?

3                THE DEFENDANT:  It is, Your Honor.

4                THE COURT:  Happy birthday.  I think you would have

5     chosen another day.  If you had mentioned it, I wouldn't have

6     sentenced you on your birthday.

7     You have no criminal history.  In terms of education,

8     you have a GED.  You, obviously, have training in various

9     skills:  plumbing, heating, various other mechanical work.

10    The last employment that I have -- although I understand

11    you have a new job -- you had been employed with a mechanical

12    corporation performing plumbing, heating, and mechanical work,

13    which you had started in 2015.  Also in 2015 you had -- were a

14    grounds staff member at a country club.  And from 2012 to 2015,

15    a mover and installer for another company.

16    Finances -- although I did not get a financial

17    information because you didn't release things; so I wasn't able

18    to determine if you can pay a fine.  So I'll find you have the

19    ability to pay a fine, but I'm not going to impose one.  You do

20    have $500 in restitution.

21    In terms of physical, mental health -- or mental health

22    or emotional health, there were no issues.  Substance abuse,

23    last smoked marijuana at age 21; so that's not a current issue.

24    On a personal basis, signed release forms were not

25    received.  So we're somewhat limited, although his father did

1    provide information to corroborate much of it.

2          The -- Mr. Vogel was born into an intact union.  Father

3    employed as a project manager.  His mother is a homemaker.  He

4    has three siblings, ages 33, 22, and one -- ages 33 to 22.  One

5    employed.  One in college.  Mr. Vogel grew up in the Bronx

6    until he was 14 years old.  Then his parents, with the

7    defendant, moved to Pawling, New York.  P-a-w-l-i-n-g.

8          Before his arrest, he was living on his own.  He's now

9    living, at least what the presentence report writer indicated,

10   with his parents.  He had a normal childhood.  He's not married

11   and has no children.  And it's clear that his family is very

12   supportive of him, evidenced by the fact that his father is

13   here today.

14         Let me just do -- get the computer up here.  They go

15   off, and I have to put the security code back in.

16         All right.  In terms of the offense -- the statement of

17   offense that Mr. Vogel agreed to put it in context with a

18   little bit of information.  Although I think everybody knows

19   this, but I still think it's important timing-wise to put in

20   context.

21         The U.S. Capitol, located in southeast D.C., is secured

22   24 hours a day by Capitol Police.  Restrictions around the

23   Capitol include permanent and temporary security barriers and

24   posts manned by the Capitol Police.  Only authorized people

25   with appropriate identification are allowed access inside the

1    U.S. Capitol.  On January 6th, 2021, the exterior plaza of the

2    U.S. Capitol was closed to members of the public.

3            On that day, a Joint Session of the U.S. Congress

4    convened at the U.S. Capitol.  During the Joint Session,

5    elected members of the House of Representatives and the Senate

6    were meeting in separate chambers at the Capitol to certify the

7    vote count of the Electoral College of the 2020 Presidential

8    Election, which had taken place on November 3rd, 2020.  The

9    Joint Session began at approximately 1:00.  Around 1:30, they

10   adjourned to separate chambers to resolve an objection.

11           Vice President -- or then-Vice President Mike Pence was

12   present and presiding, first in the Joint Session and then in

13   the Senate chamber.  The proceedings continued in the House and

14   the Senate.

15           A large crowd then had gathered outside the Capitol.

16   Temporary and permanent barricades were in place around the

17   exterior of the Capitol.  Capitol Police were present and were

18   attempting to keep the crowd away from the Capitol Building and

19   the proceedings underway inside.

20           At approximately 2:00 p.m., certain individuals in the

21   crowd forced their way through, up, and over the barricades.

22   And officers of the Capitol Police and the crowd advanced to

23   the exterior facade of the building.

24           The crowd was not lawfully authorized to enter or remain

25   in the building.  And prior to entering the building, no

1    members of the crowd submitted to security screenings or

2    weapons checks by the Capitol Police or other authorized

3    security officials.

4        At that time, the certification proceedings were still

5    underway.  The exterior doors and windows of the Capitol were

6    locked or secured.  Capitol Police attempted to maintain order

7    and keep the crowd from entering the Capitol.

8        Shortly after 2:00 p.m., individuals in the crowd forced

9    entry into the U.S. Capitol, including by breaking windows,

10   assaulting members of the Capitol Police, as others in the

11   crowd encouraged and assisted those acts.  The result -- the

12   riot resulted in substantial damage to the Capitol.  The

13   expenditure, I think at this point, is $2.8 million for

14   repairs.

15       At about 2:20 -- and timing is important -- members of

16   the House of Representatives and the Senate were instructed to

17   and did evacuate the chambers.  All proceedings of the

18   Capitol -- of the U.S. Congress, rather, including a Joint

19   Session, were effectively suspended until after 8:00 p.m.  It

20   took some time for them to have everyone leave the building and

21   also to make sure that the building itself was secured.

22       In terms of Mr. Vogel's participation, during the

23   morning of January 6th, 2021, he traveled from New York to D.C.

24   to participate in the protest occurring that day in

25   Washington, D.C.  While in D.C., Mr. Vogel participated in the

1    riot on the U.S. Capitol Grounds and in the U.S. Capitol

2    Building.

3            Shortly after participating in the riot in Washington,

4    defendant posted a story consistent -- consisting of videos he

5    took while participating in the riot on the grounds and inside

6    the Capitol Building.  This was done to his Snapchat account.

7    The videos show multiple people damaging scaffolding and police

8    barriers on the grounds.

9            Thereafter, Mr. Vogel entered the U.S. Capitol Building

10   and moved through various halls and corridors inside the

11   Capitol Building.  He recorded his entrance into the

12   Capitol Building on his phone.  The video depicts other rioters

13   chanting "Take it back" and climbing into the U.S. Capitol

14   Building through broken windows.  An alarm is clearly audible.

15   Mr. Vogel went through the doors.

16           Mr. Vogel remained in the Capitol Building for

17   approximately 20 minutes.  While inside, he shouted alongside

18   other rioters.  He hugged and fist-bumped other rioters inside

19   the Capitol Building.  While still inside, Mr. Vogel was also

20   seen picking up and discarding trash, was ultimately escorted

21   out of the U.S. Capitol Building by the U.S. Capitol Police

22   officers.

23           After being escorted out of the Capitol Building,

24   Mr. Vogel remained on the Capitol Grounds, reclimbed the east

25   steps of the U.S. Capitol, and waved a flag containing the

1    words Trump 2020.  Mr. Vogel wore a large red hat and a tan

2    jacket so that you can recognize him in the videos.  He

3    previously posted on Facebook a photo of himself wearing the

4    same large red hat which bears the words, quote, Make America

5    Great Again, unquote.  In addition, the FBI recovered the large

6    red hat and tan jacket from his residence and car,

7    respectively, during the execution of a search warrant.

8         Mr. Vogel also posted on Facebook about participating in

9    the January 6th, 2021, riot.  For instance, on January 7th, the

10   defendant communicated via his Facebook account with User 1,

11   defendant's Facebook friend, by sending User 1 a video of the

12   riot and occupation of the Capitol Building.  User 1 responded

13   that he or she saw a picture of the defendant in D.C., after

14   which the two discussed the events of January 6th.

15        Also on January 7th, Mr. Vogel sent a separate Facebook

16   friend, User 2, the video he shared via his Snapchat account.

17   User 2 asked the defendant, quote, Did you take that?

18   Defendant replied "Yes, ma'am" and went on to state, "So they

19   had these shadow Twitter accounts, and they're trying to report

20   me to the FBI/DOJ and put me away for 10 years for domestic

21   terrorism because of my Snapchat story where I simply walked

22   into the lobby of the Capitol and didn't even film anything

23   crime-wise."

24        Defendant also communicated with the third Facebook

25   friend, User 3, about his participation in the January 6th

1    riot in D.C.  On January 6th, defendant sent User 3 a message

2    verifying his location in D.C.  After -- defendant and User 3

3    sent multiple messages back and forth, to include the defendant

4    sending User 3 the aforementioned video that defendant shared

5    by his -- through his Snapchat account.  In subsequent messages

6    to User 3, Mr. Vogel references, quote, Stop the Steal

7    2021 [sic] and meeting a few Capitol officers.  After,

8    defendant and User 3 continued to discuss defendant's

9    involvement during the riot and provide their thoughts on

10   defendant's criminal culpability.

11        So this is a serious offense, participating in an

12   insurrection to disrupt the proceedings in Congress to certify

13   the Electoral College vote for the presidential election, and

14   there are serious consequences to your actions.  Citizens have

15   to be deterred from ever engaging in this type of behavior,

16   regardless of your political beliefs.  This is not a political

17   case.  It doesn't matter what your political views are or your

18   affiliations.  You're here for unlawfully entering the Capitol,

19   the seat of our democracy, in the midst of an insurrection, not

20   because of your views.

21        What gives me pause as to whether you have been deterred

22   and others are going to be deterred are posts the day after, on

23   January 7th, where in posting to your brother, one of the first

24   comments was, quote, What was the best rock concert I've been

25   to, unquote.  And you added your own answer, quote, "Stop the

1    Steal" 2020.  Your initial reaction to this insurrection, as
2    comparing it to a rock concert?  When your brother rightly
3    pointed out, "You shouldn't be bragging about that day that
4    resulted in four deaths," you somewhat flippantly replied
5    "Evidently you were watching the videos, and you should have
6    went to this one."
7         There are other things that you did, eventually,
8    indicate to your brother that -- you know, disagreed with him
9    about some of the things in terms of the actions of the
10   officers as it related, evidently, to Ashli Babbitt.
11        But you minimize your participation on these media
12   posts, quote, Just walked around the lobby, unquote, and didn't
13   film anything crime-wise.  Being in the Capitol was a crime.
14   So you videoed what your criminal conduct was, which was being
15   there.
16        You challenged others, quote, You don't have evidence I
17   was in there.  But that's belied by the videos and, frankly,
18   your -- and your voluntary post-arrest interview with the FBI.
19   Evidently, you were initially unwilling to admit your
20   involvement.  After learning they had a bunch of video evidence
21   of your being in the Capitol, which we've seen, you admitted
22   it; also admitted that you saw broken glass, people moving
23   police barriers, but minimized your role, quote, only trying to
24   film criminal activity, unquote.
25        You filmed the following -- or there was a video of

1    this.  You approached the Capitol Building from the West Lawn,

2    and you can see rioters taking down bicycle racks put up by the

3    police as barriers.  You can see rioters climbing on the

4    scaffolding covering the northwest stairs, which leads,

5    eventually, to the outside Senate wing doors.

6         There's a flash-bang grenade that exploded nearby --

7    obviously thrown by law enforcement -- which should, certainly,

8    have given you pause about continuing forward.  They were,

9    obviously, trying to deter you.  You joined the rioters

10   underneath the scaffolding and up the northwest stairs; rioters

11   chanting "Whose house?  Our house!"  You walked to the Senate

12   wing door while rioters entered the Capitol through broken

13   windows.  You went through the door.

14        There's a siren alarm blaring.  You can't miss it.  You

15   entered at about 2:26.  Now, keep in mind when the -- this is

16   not that long after the 2 o'clock time that I had talked about.

17   They're still evacuating Congress.

18        You followed rioters into the Crypt.  Some rioters --

19   not you, but -- certainly, were aware that -- pushback against

20   a line of police officers.  You recorded this.  You recorded a

21   rioter exclaiming, "We have the power."  And you replied

22   "Amen," in agreement.  You then shouted, Let this be a message

23   to the Chinese communists, unquote.

24        In the Crypt you hugged and fist-bumped other rioters,

25   evidence you shared a common cause.  When Capitol Police

1   started to clean the -- clear the area, you were directed --

2   it's only one pointing.  I would agree with Mr. Ohm.  It's one

3   officer pointing to the door, but you certainly could see what

4   he was doing.  You remained.  You wandered around the Crypt.

5   You spent about 20 minutes in there.  You then at a later point

6   were picking up garbage and putting it in a garbage bag.

7   Eventually, you were escorted out of the building.

8        You didn't leave the grounds.  You continued to trespass

9   for another 30 minutes on the east steps.  You stated that you

10  wanted to film, like a journalist.  Well, you needed to have

11  the Capitol Police give you press credentials, which you didn't

12  have.  So you would not have been considered a journalist.

13       I want to emphasize the importance of this conduct.

14  This relates to our democracy.  Our democracy is really

15  fragile, and violence is an unacceptable way to resolve

16  political differences.  You're entitled to political views.

17  You're entitled to protests, but not to have an insurrection.

18  There's a peaceful way to protest and to transfer power.  And

19  we're going to have coming elections in 2024, and I want to

20  make sure that people that have participated in this

21  insurrection do not wind up in another one in 2024.

22       I want to point out, certainly there was another

23  election back in 2000, Bush v. Gore.  It was a presidential

24  election.  There was controversy about votes, and they were

25  contested.  The Supreme Court made a decision, which decided

1    the election.  There were those in our country who were very

2    divided as they are today, disagreed with the results, but the

3    power was transferred peacefully to President Bush --

4    then-President Bush.  So there's an example of the same kind of

5    thing, presidential election, issues about votes.  It was done

6    peacefully.

7         You did get two letters of support that came in.  One is

8    from a retired New York police detective who was injured due to

9    the 911 terrorist attack.  He was working on the crime scene

10   site, and that seems to have been when he was injured.

11   Certainly comes from someone whom I would respect.  He's,

12   obviously, a family friend.  You spent time with the detective

13   and the detective's grandchildren.  Always kind and patient

14   with them.  They're evidently 10 and 6 years old.  He describes

15   you as a Good Samaritan, helping out both your family and the

16   community members.  He describes you as not a destructive

17   person but somebody who works and involved in building and

18   reconstruction.

19        You have another friend who's known you since you were

20   14 years old, describes you as caring, frugal, willing to help

21   others; that you've done plumbing jobs for free for those who

22   could not afford your services.

23        Although you didn't destroy property nor engage in

24   assaultive behavior -- but I wouldn't call you a totally

25   passive participant.  Your behavior did -- was -- in terms of

1   participating in this insurrection was morally culpable and

2   damaging to our democracy.  Your presence in the mob did help

3   create a momentum of violence, as well as encouraged others --

4   cheering, the fist bump, in terms of a comradeship.

5       Having a large number of people, including you,

6   participate in the insurrection provided safety for those who

7   were violent and for the violent acts of others.  Even though

8   you witnessed them, although -- you didn't participate.  It

9   should be clear to you you weren't authorized to be on the

10  Capitol Grounds and in the Capitol.

11      Now, in the positive end, you did plead guilty.  It was

12  shortly before the trial date, but I accepted your plea.

13  Acceptance of responsibility is important.

14      You have no criminal record.  You've been compliant with

15  all of your release conditions.  I would -- the concern I have,

16  frankly, is expressions of remorse to me go to deterrence.

17  Your post after -- after January 6th do not, I think, evidence

18  remorse for your actions, which is something -- a factor that I

19  consider.

20      The statements that you made today, you continue to

21  accept responsibility for participating in the insurrection.

22  You've acknowledged you should have used better judgment.

23  There are, obviously, consequences in terms of your being here

24  today.  You do not support violence, and you support law

25  enforcement.

1        But I don't consider that really remorse.  There's no

2    apology to the country or its citizens for what you got

3    involved in or, importantly, a full appreciation, frankly, of

4    the gravity of your actions and its effect on our democracy.

5        I've had three defendants -- and only three out of the

6    numerous defendants I have sentenced -- particularly with these

7    charges, the misdemeanors, who have expressed remorse and that

8    they understood the gravity of their actions and its effect on

9    our democracy, where they actually apologized to the nation and

10   to others.

11       So I am going to give you a history lesson.  I've been

12   doing this with others.  I'm hoping it has some effect because

13   I think it's important to put the actions of January 6th in

14   context.

15       The insurrection is not just contrary to the

16   Constitution.  Any mob action undermines it and the rule of

17   law, the equal application of the law as well.  Almost

18   two centuries ago, Abraham Lincoln discussed what he called the

19   danger of mobocratic spirit.  Even when you think unlawful

20   action is warranted, that unlawful action, as Lincoln

21   explained, wears down our institutions and degrades our

22   constitutional government.  The more lawless action, the more

23   others feel justified in engaging in lawless actions, even

24   those you disagree with.

25       What if those U.S. citizens who were led astray by the

1    fervent zeal of a demagogue come to erroneously believe that

2    their liberty has been stolen?  Do the supporters of the

3    insurrection of January 6th want to inspire them to rebel based

4    on nothing more than, it turns out, lies?  Lawlessness breeds

5    lawlessness, and no American should want today what comes by

6    blood.  I hope the punishment I impose will, as Lincoln said,

7    fortify against the revolutionary fervor that you and others

8    shared on January 6th, 2021, and may still share today.

9         Again, for those who earnestly think an election stolen,

10   events like those of January 6th will only harm the

11   Constitution than help it.  We've had corrupt presidential

12   elections in our past, in 1824 and 1878, and they were not

13   cause for insurrection.  With debate, protest, and electoral

14   participation, both of those elections were remedied.  The one

15   contested presidential election where citizens engaged in

16   insurrection, some wrongly believing the election had been

17   stolen, it's 1960 [sic], the bloodiest war of our history, and

18   that's the Civil War.

19        Our first founding document lists the litany of offenses

20   that together, and only together, supported a revolution.

21   Unlike the Americans of 1776, electoral means remain available.

22   Insurrection is not and cannot ever be warranted under our

23   system of democratic government.

24        For the second group, those who know that no election

25   was stolen, but who, nonetheless, rioted to install their

1    preferred candidate, know that the antidemocratic installation

2    of a preferred candidate can bring only tyranny.  These

3    defendants might think this system of government better.  It's

4    not.  A fact Americans have known since our founding.  Our

5    founders and the people of their time chose this Constitution

6    because they knew the alternatives are far, far worse.

7         Abandoning the rule of law in this way results in

8    systems of government that benefit no one but the rich and

9    powerful.  And there have certainly been other authoritarian

10   countries -- Venezuela, Chile, Argentina -- who have taken

11   various actions in that -- in that way.

12        As Madison explained in Federalist 51, it's only through

13   constitutional government that the interests of the many cannot

14   impinge on the freedom of the fewer and vice versa.  You and

15   all Americans should be thankful to live in a democracy and not

16   one of the countries I mentioned, and certainly there are other

17   authoritarian countries that exist presently.

18        As Lincoln said, quote, Let every American, every lover

19   of liberty, every well-wisher to his posterity swear never to

20   violate the laws of our country and never to tolerate their

21   violation by others, unquote.

22        Violence is an unacceptable way to resolve political

23   differences.  There are lawful means available in a democracy

24   to change or challenge actions you disagree with, and you're

25   entitled to disagree with them, which do not include a violent

1    insurrection.

2         Your presence and actions by joining other

3    insurrectionists was an inexcusable attack on our democracy and

4    the peaceful transfer of power according to the Constitution,

5    and a disrespect for the rule of law which governs civilized

6    societies.  You should appreciate what an extraordinary country

7    you live in with a vibrant democracy.  You should appreciate

8    how lucky you are to live in its democracy as opposed to some

9    other country ruled by an authoritarian.  And as I indicated,

10   there's certainly enough of them around at this time.

11        In terms of parity -- and I do keep track of my

12   sentences and their various -- the government keeps track of

13   them.  The probation office keeps track of them.  I'm sure FPD

14   keeps track of them.  But for this particular misdemeanor --

15   parading, picketing, demonstrating -- frankly, I think the

16   threshold should be jail as the starting point based on the

17   damage this criminal conduct on January 6th inflicted on our

18   democracy.  And that's where the damage and criminal conduct is

19   focused.

20        Now, not all of the defendants with this charge

21   demonstrated for as long as you did inside and out.  Many of

22   them were there for less than 8 minutes.

23        God bless you.

24        Not all continued to stay when -- although, granted,

25   there it was only one pointing and a later one -- but directed

1    by law enforcement to get out.  Not all ignored a flash-bang

2    grenade going off nearby, clearly intended by law enforcement

3    to -- to deter rioters from moving forward and going into the

4    Capitol.

5         Not all entered under the scaffolding's torn tarp

6    revealing the inner stairways.  Not all entered after

7    witnessing rioters scaling the scaffolding.  Not all celebrated

8    their conduct afterwards.  Not all accepted responsibility

9    shortly before trial.  Some pled on arrest, and I've had

10   several that came in and pled right off the bat, admitted in

11   their FBI interviews what they did and admitted it in terms of

12   their plea.

13        Your conduct is decidedly, from my perspective, on

14   average worse than some other defendants with this charge that

15   I have sentenced, and I'm looking at it from my perspective.

16   I've sentenced people to probation, people to probation with

17   home detention.  I've sentenced them to intermittent

18   confinement to jail time and certainly far more jail time than

19   I would be considering in this case.

20        Each judge has different defendants.  Each charge may be

21   the same, but the facts differ in each particular case.  So

22   it's very hard to come up with, you know, the exact, you know,

23   matrix to be able to say that this is what -- with these facts,

24   this is what they necessarily get.  There's certainly factors

25   which I've set out.

1          So in terms of the sentencing itself, pursuant to the

2     Sentencing Reform Act of 1984 and in consideration of the

3     provisions of 18 U.S.C. 3553, it's the judgment of the Court

4     that you, William Vogel, are hereby committed to the custody of

5     the Bureau of Prisons for a term of 30 days' incarceration on

6     Count 1.  You are further sentenced to serve a -- Count 4.

7     Excuse me.  On Count 4.  You are further sentenced to serve a

8     36-month term of probation as to Count 4.

9          In addition, you are ordered to pay a special assessment

10    of $10 in accordance with 18 U.S.C. § 3013.  While on

11    supervision, you shall abide by the following mandatory

12    conditions, as well as all discretionary conditions recommended

13    by the probation office in Part D, sentencing options of the

14    presentence report, which were imposed to establish the basic

15    expectations for your conduct while on supervision.

16         The mandatory conditions include:  You must not commit

17    another federal, state, or local crime.  You must not

18    unlawfully possess a controlled substance.  You do not appear

19    to have an issue with -- in terms of substance abuse; so I will

20    not require the drug testing.  You must make restitution in

21    accordance with 18 U.S.C. §§ 3663 and 3663(a) or other statutes

22    authorizing restitution.

23         You'll comply with the following special conditions --

24    I'm finding that you don't have the ability to pay a fine and

25    waive imposition of a fine in this case.  You are ordered to

1    make restitution in the amount of $500 to the Architect of the

2    Capitol.  I'm finding that you don't have the ability to pay

3    interest and waive any interest or penalties that could accrue

4    on the balance.  Restitution payments are made to the Clerk of

5    the Court for the District Court in Columbia -- District of

6    Columbia, which will then be reimbursed and disbursed to the

7    Architect of the Capitol.

8         The financial obligations are immediately payable to the

9    Clerk of the Court.  Within 30 days of any change of address,

10   you'll notify the Clerk of the Court of the change until such

11   time as the financial obligation is paid in full.  You must pay

12   the balance of any restitution within 30 days of release of

13   confinement or at the rate of not less than $50 per month.

14        I think you can pay that.  Is that -- can you pay that

15   much?

16             THE DEFENDANT:  (Nods head.)

17             THE COURT:  All right.  If not, I'll make it smaller.

18        Until you have satisfied your financial obligations, you

19   must provide the probation officer with access to any requested

20   financial information and authorize the release of any

21   financial information.  The probation office may share

22   financial information with the U.S. Attorney's Office.  That's

23   only until you satisfy your financial obligations.

24        The probation office shall release the presentence

25   investigation report to all appropriate agencies, which

1   includes the U.S. Probation Office in the approved district of

2   residence, in order to execute the sentence of the Court.

3   Treatment agencies shall return the presentence report to the

4   probation office on the defendant's completion or termination

5   of treatment.

6        In terms of the appeal, because there was a specific

7   waiver in the plea agreement, I will indicate that.  You agree

8   to waive or give up insofar as such waiver is permitted by law:

9   The right to appeal the conviction on any basis, including the

10  statute's unconstitution [sic] that you're pleading guilty to,

11  which at this present time is constitutional; the admitted

12  conduct doesn't fall within the scope of the statute.  At this

13  point the conduct does fall within the statute.  If at some

14  later point the Court of Appeals determines either one of these

15  is unconstitutional or your conduct was not criminal, then you

16  can take a collateral appeal.

17       You also are agreeing to give up the right to appeal the

18  sentence in this case, which would include a term of

19  imprisonment, award of restitution, authority of the Court to

20  set conditions of release, and the manner in which the sentence

21  was determined, except to the extent if I sentence you above

22  the statutory maximum, which I didn't do.

23       You also -- notwithstanding the above agreements, to

24  waive or give up the right to appeal the conviction and

25  sentence.  You'll retain the right to appeal on the basis of

1    ineffective assistance of counsel, but not to raise on appeal

2    other issues regarding the conviction or sentence, other than

3    what I've indicated.

4         In terms of a collateral attack, which is an attack at a

5    later point, you're waiving your right to challenge the

6    conviction and the sentence imposed, otherwise attempt to

7    modify or change the sentence or the manner in which it's

8    determined in a collateral attack.  Not a direct appeal.  And

9    that can be under 2255, which is a writ of habeas corpus,

10   procedures that challenge final judgments, except to the extent

11   if that motion is based on newly discovered evidence or a

12   claim, again, that you received ineffective assistance of

13   counsel.

14        Any notice of appeal that would fit any of these

15   categories must be filed -- direct appeal must be filed within

16   14 days of the entry of judgment or within 14 days if there's a

17   notice of appeal by the government.  If you're unable to afford

18   the cost of an appeal, you can request permission from the

19   court to file it without cost to you.  You can also ask for

20   court-appointed counsel.

21        I am going to defer your having to report to the Bureau

22   of Prisons to a later date.  Do you have things coming up that

23   you need to take care of?  Dates -- and I'll make it after

24   that.  Are things coming up?  I'll give you a period of time,

25   about six weeks, to get your matters in order.  But are there

1  other events that are coming up that you would like to be able

2  to attend?

3            MR. OHM:  No, Your Honor.

4            THE COURT:  Okay.  So I'll defer -- your reporting to

5  the Bureau of Prisons will not be before July 28th of 2023.

6            The probation terms will start -- you should talk to the

7  probation officer who's here about what's involved with that.

8  They'll set you up.  And then depending on -- assuming you're

9  going to stay where you're living, that -- they need to

10  transfer.  I'm not transferring jurisdiction, but I will

11  transfer the supervision, since it's hard for the D.C. office

12  to do it.  They should set you up and get that going before you

13  report.

14            Mr. Ohm, is there a place you want to recommend?

15            MR. OHM:  Yes, Your Honor.  Otisville, please.

16            THE COURT:  I'm sorry?

17            MR. OHM:  Otisville, O-t-i-s-v-i-l-l-e.

18            THE COURT:  Okay.  Is that near where he lives?

19            MR. OHM:  Yes.  It's the closest one in New York.

20            THE COURT:  Okay.  I'll put that in.

21            MR. OHM:  One other request, Your Honor.

22            THE COURT:  Sure.

23            MR. OHM:  For conditions of probation, could they be

24  modified so that he could leave the jurisdiction for work

25  purposes?  He does do work in --

 1          THE COURT:  You mean pretrial?  Because he's -- well,

 2     I guess he's going to be in -- he's -- I think his pretrial

 3     conditions are separate.  He will be starting probation; am I

 4     correct?  Let me ask the probation officer.

 5          THE PROBATION OFFICER:  Your Honor, he will not start

 6     probation until he has completed his term of imprisonment.  I

 7     think what Mr. Ohm is referring to is --

 8          THE COURT:  The pretrial services?

 9          THE PROBATION OFFICER:  He will still be on pretrial.

10     However, during the term of supervision -- I believe he works

11     in various states, and Mr. Ohm had -- had inquired about him

12     being given permission to travel for work purposes.

13          THE COURT:  Okay.  You'll have to continue with your

14     pretrial services, which you've been compliant.

15          I will allow you to travel for work.  You need to notify

16     the pretrial services that you're going so they know it's for

17     work.  So they know where you are.  So it's a notification.

18          Where are you working now at this point?  Maybe Mr. Ohm

19     can tell me what it is or --

20          MR. OHM:  S & D.

21          THE DEFENDANT:  As in the location?

22          THE COURT:  I'm sorry?

23          THE DEFENDANT:  As in the location?

24          THE COURT:  Okay.  Oh, S & D location.

25          THE DEFENDANT:  No, no.  As in the location of where

1   I'm working?  Like the area or the address?

2           THE COURT:  What's the name of the company?

3           THE DEFENDANT:  Tri County Plumbing and Heating

4   Corporation.

5           THE COURT:  Okay.  Is that -- is that in --

6           THE DEFENDANT:  Dutchess County.

7           THE COURT:  And so what kind of work are you doing?

8   You're plumbing and --

9           THE DEFENDANT:  Heating and plumbing contractor,

10  mechanical contractor.

11          THE COURT:  Okay.  All right.  I'll allow -- I'll

12  change your pretrial conditions to allow you to travel for work

13  outside of New York as long as prior to going you just notify

14  pretrial services.

15          MR. OHM:  And, Your Honor, I believe one of the

16  standard conditions of probation also includes a restriction

17  where he would --

18          THE COURT:  I don't know about that.

19          MR. OHM:  It's No. 8.

20          THE COURT:  I think it depends on where you are as to

21  what their conditions are.  Let me ask probation.

22          THE PROBATION OFFICER:  The standard condition says

23  that he would not be able to travel outside of the jurisdiction

24  in which he resides without permission from the probation

25  office.  That's why he -- Mr. Ohm was requesting that that

1    condition be modified or expanded to include him being able to

2    travel for work purposes during probation.

3              THE COURT:  During probation -- not only pretrial,

4    but probation?

5              THE PROBATION OFFICER:  I'm assuming both.

6              THE COURT:  Does the government have a position on

7    this?

8              MR. DIAMOND:  The government would not oppose

9    modifying the conditions to allow Mr. Vogel to work.

10             THE COURT:  Okay.  All right.  Then I'll do both.

11   Pretrial -- notify pretrial before going out of -- out of --

12   out of New York state for work.  Notification should be

13   before -- prior notification.

14             And then I'll indicate -- I'll put in the sentence that

15   notice -- let's see.  Can travel out of state from New York for

16   work purposes with approval of the -- probation.  If you've got

17   problems with him, then there may be an issue.  But if there's

18   no issues with him, he can move, he can travel.

19             All right.  There's also a -- the *Hunter* decision which

20   indicates that -- if I've already discussed it, you don't need

21   to discuss it again.  But are there -- anything else that needs

22   to be brought up or brought to my attention at this time?

23             Probation, anything from you?

24             THE PROBATION OFFICER:  No, Your Honor.

25             THE COURT:  Okay.  Government, anything from you?

1          MR. DIAMOND:  Your Honor, the government would just

2     move --

3          THE COURT:  You need to do it in front of the

4     microphone so we can hear you.

5          MR. DIAMOND:  Sorry.  The government would just move

6     to dismiss the remaining counts of the indictment.

7          THE COURT:  All right.  The remaining counts are

8     dismissed.

9          Mr. Ohm, anything else?

10          MR. OHM:  No, Your Honor, other than what's already

11     been stated.

12          THE COURT:  Okay.  Then I'll just make sure we put it

13     in both the pretrial order, as well as the -- as well as the

14     sentencing for the probation.

15          Mr. Vogel, I hope you think carefully about this and you

16     will -- and I will not see you back in this court under these

17     circumstances.

18          You know, you're the next generation of people who are

19     voters.  I want you to think carefully about it and to be --

20     not to remove yourself from politics.  You can have whatever

21     politics you want.  Just participate peacefully.

22          All right.  Parties are excused.

23          (Proceedings were concluded at 3:57 p.m.)

24

25

1          CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                         Dated this 4th day of October, 2023.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25